IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| JAMES CHRISTOPHER JOHNSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:23-cv-1431 (LMB/LRV) |
| ) | |
| ROSA ORTIZ, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION

Plaintiff James Christopher Johnson ("plaintiff" or "Johnson") has filed a two-count Complaint, in which he brings a claim under 42 U.S.C. § 1983 for a violation of his Fourth Amendment right to be free from malicious prosecution and a separate claim under Virginia common law for malicious prosecution. [Dkt. No. 1] ("Complaint"). Both claims stem from the same set of alleged facts, namely, that defendant Detective Rosa Ortiz ("defendant" or "Detective Ortiz") initiated criminal proceedings against Johnson without probable cause and presented false testimony to a Virginia special grand jury that indicted plaintiff for a murder-for-hire plot to kill his fiancée. Before the Court is Detective Ortiz's Motion to Dismiss the Complaint for failure to state a claim. [Dkt. No. 9] ("Motion to Dismiss"). Oral argument has been held, and for the reasons that follow, defendant's Motion to Dismiss will be granted.

I.

In the fall of 1991, plaintiff James Christopher Johnson and Andrea Cincotta ("Cincotta") became engaged and moved into an apartment together in Arlington, Virginia. [Dkt. No. 1] at

¶¶ 8, 11-12.[1] Seven years later, on August 21, 1998, Johnson departed for work at approximately 8:00 a.m. Id. at ¶ 17. After repeated failed attempts by phone to reach Cincotta during the day, Johnson returned home from work at 6:00 p.m. Id. at ¶¶ 17-19. Cincotta was not home when Johnson returned, and her car was missing. Johnson called one of Cincotta's friends and her son, Kevin Cincotta, to see if either had seen or heard from Cincotta that day. Neither responded. Id. at ¶¶ 19-20. Johnson then called the local hospital to see if Cincotta had been admitted, fearing that she might have been in a car accident. The hospital did not have information regarding Cincotta's whereabouts. Id. at ¶ 21.

That evening, while waiting for Cincotta to return home, Johnson "did laundry, cleaned his truck, and ate a light dinner, before falling asleep for a while in his bed." [Dkt. No. 15] at 2 (citing [Dkt. No. 1] at ¶¶ 22-23). After waking up at 1:00 a.m. and realizing that Cincotta had still not returned home, "he looked around their bedroom," and "noticed that the bedroom closet door was closed." [Dkt. No. 1] at ¶¶ 23-24. Johnson opened the closet door and found Cincotta's lifeless body on the floor. He called the police to report her death at approximately 1:24 a.m. Id. at ¶¶ 24-25. An autopsy revealed that Cincotta's cause of death was strangulation. Id. at ¶ 26.

Officers of the Arlington County Police Department ("ACPD") initially suspected that Johnson murdered his fiancée and staged the discovery of her body. In the three days following Cincotta's death, Johnson was interrogated for a total of 28 hours by ACPD officers. During the course of that investigation, ACPD officers lied to Johnson, gave him false information about the time of Cincotta's death, and claimed to have discovered his fingerprints on her neck. Id. at

---

[1] All factual allegations are derived from plaintiff's Complaint, [Dkt. No. 1], and are assumed true for purposes of evaluating defendant's Motion to Dismiss, to the extent that the allegations do not constitute mere opinions or conclusions.

¶¶ 31-33. Johnson ultimately described a hypothetical "vision" to the officers, in which he claimed to have possibly hit Cincotta, causing her to strike her head on a desk, and then he proceeded to give her CPR. Id. at ¶ 34. When asked to explain what happened next, Johnson said "he must have" put Cincotta in the closet and closed the door. Id. ACPD had this "vision" statement evaluated by two experts—first in 1998 and again in 2022—both of whom told ACPD that it was a coerced-internalized false confession. Id. at ¶ 35.

During the course of the ACPD investigation, both Johnson and Kevin Cincotta told officers that Cincotta had a recent interaction with a Bobby Joe Leonard ("Leonard"). Cincotta had invited Leonard into her home, including her bedroom, to provide him with a donated computer three weeks before she was murdered. Id. at ¶¶ 37-38, 40. Leonard had recently been released from prison after serving a sentence for assault and forcible sodomy, and he was employed doing maintenance work around Cincotta's apartment complex at the time of her murder. By the time ACPD learned of Leonard, he was already back in jail for beating and choking his then-wife. Id. at ¶¶ 39, 41. When questioned, Leonard denied murdering Cincotta. ACPD officers eliminated him as a suspect and issued a press release stating that the murderer was not a stranger to Cincotta and that the public was not at risk. Id. at ¶¶ 42-44. In 2000, Leonard was sentenced to life in prison for the abduction, rape, and attempted murder of a 13-year-old Fairfax County girl. Id. at ¶ 47. The investigation of Cincotta's murder went cold.

In 2013, ACPD Detective Rosa Ortiz reopened Cincotta's cold case. Five years later, on June 27, 2018, Detective Ortiz asked Kevin Cincotta to wear a recording device and attempt to get Johnson to confess to killing Andrea Cincotta. When asked by Kevin Cincotta, Johnson denied any role in his fiancée's death. Id. at ¶¶ 49-50. More than one year later, on October 10, 2018, Detective Ortiz visited Leonard in prison. At that meeting, Leonard indicated that he

3

might have relevant information about Cincotta's death and that he would speak to Detective Ortiz on the condition that his involvement in Cincotta's death would not be prosecuted as a capital offense. Id. at ¶ 51. Detective Ortiz responded: "I can't speak for what they will do, but I can tell you what my experience is. I've had . . . [a] murder-for-hire case, my most recent case, 3 co-defendants, and they'll take the death penalty off." Id. The interview ended. Detective Ortiz subsequently obtained approval from the Commonwealth Attorney to prosecute the case as a non-capital offense.

On October 16, 2018, Detective Ortiz again visited Leonard in prison, where he confessed to killing Cincotta as part of a murder-for-hire arrangement. Id. at ¶¶ 51-53. Without saying Johnson's name, Leonard claimed: he was hired to murder Cincotta by a man he never met and only spoke with over the phone; the man on the phone "sounded Caucasian, older, and described himself as an engineer;" the man expected Leonard to commit the murder the next day and agreed to pay Leonard $5,000; the man promised the $5,000 would be located in the apartment when Leonard committed the murder;[2] and the man had been present at Leonard's sentencing hearing for the abduction, rape, and attempted murder of the 13-year-old girl, the offense for which Leonard was presently incarcerated. Id. at ¶ 54. At the time of the October 16, 2018 interview, Leonard had never met or seen Johnson, and Johnson was not present at Leonard's sentencing hearing. Id. at ¶¶ 55-56. Detective Ortiz did not play a recorded sample of Johnson's voice to Leonard to determine if he could match it to the voice of the mystery caller, despite having access to several samples of Johnson's voice from his 1998 police interrogations. Id. at ¶ 58.

---

[2] Leonard claimed that the $5,000 was not in the apartment and he never received payment for killing Cincotta.

4

After obtaining Leonard's confession, Detective Ortiz directed two additional undercover operations to attempt to obtain a confession from Johnson. First, on December 11, 2018, undercover officers attempted to get Johnson to admit that he owed Leonard money for the murder, and second, on December 27, 2018, officers attempted to obtain a confession from Johnson. Id. at ¶¶ 59-61. Both times, Johnson denied any involvement in Cincotta's murder.

The following summer, on June 4, 2019, Detective Ortiz directed the ACPD fingerprint lab to test the crime scene prints for matches to Johnson and Leonard. Of the usable fingerprints, 45 belonged to Johnson, and unknown foreign male DNA was found on Cincotta's bra and dress buttons. Detective Ortiz did not test the contents of a vacuum cleaner located in Cincotta's bedroom on the day of her murder. Id. at ¶¶ 62-65.

The Complaint alleges that on October 19, 2021, "with Detective Ortiz's direction, initiation, and cooperation, a grand jury was convened to determine whether there was probable cause to indict [] Johnson for the murder-for-hire of [] Cincotta." [Dkt. No. 15] at 7 (citing [Dkt. No. 1] at ¶ 67). According to the Complaint, Detective Ortiz provided the following false and misleading testimony to the grand jury:

- Leonard identified Johnson by name as the one who hired him to murder Cincotta;
- 620 fingerprints were recovered from the scene, and all of the usable fingerprints belonged to Johnson;
- The injuries inflicted on Cincotta and her cause of death were consistent with the injuries Johnson described in his "vision";
- There were no signs of struggle in Cincotta's apartment or on her body;
- Johnson had a financial motive to arrange the murder because Cincotta was supporting him financially;
- Johnson and Cincotta had a history of domestic disputes;
- The apartment was found in a very clean condition, despite the fact that Johnson was allegedly a "slob" and it was believed he had cleaned the apartment that day, including by vacuuming; and
- The vacuum bag was tested and did not yield much evidence.

[Dkt. No. 1] at ¶ 68. Moreover, the Complaint alleges that Detective Ortiz did not disclose exculpatory evidence available to her, namely, the lack of motive and the unreliability of Johnson's "vision" statement. Id. at ¶ 69.

On November 12, 2021, a special grand jury found probable cause to indict Johnson and Leonard for the murder-for-hire of Cincotta in violation of Va. Code § 18.2-31.[3] Eight witnesses had appeared before the grand jury: Detective Ortiz, ACPD Chief Charles Penn, ACPD Sergeant Kimberly Jones, Sally Harris, Kevin Cincotta, Howard Cincotta, Leonard, and Johnson. [Dkt. No. 10] Exs. A, B. On November 16, 2021, Johnson was arrested for Cincotta's murder. [Dkt. No. 1] at ¶¶ 70-71.[4] The case proceeded to a jury trial in September 2022 and lasted four weeks. Id. at ¶¶ 73-75. The jury deliberated for less than one hour before returning a not-guilty verdict. Id. at ¶ 76.

II.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires a court to dismiss a claim if the "plaintiff's allegations fail to state a claim upon which relief can be granted." Abdelhamid v. Sec'y of the Navy, 525 F. Supp. 3d 671, 681 (E.D. Va. 2021) (quoting Adams v. NaphCare, Inc., 244 F. Supp. 3d 546, 548 (E.D. Va. 2017)). To survive a Rule 12(b)(6) motion, a complaint's factual allegations must be more than speculative and must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although a court must accept all well-pleaded allegations as true and view the complaint

---

[3] In her Motion to Dismiss, Detective Ortiz has provided copies of the Indictments against Johnson and Leonard, which were not attached to the Complaint. See [Dkt. No. 10] Exs. A, B ("the Indictments"). In evaluating a motion to dismiss, a court may take judicial notice of matters of public record. See Hall v. Virginia, 385 F.3d 421, 424 n.3 (4th Cir. 2004).

[4] After his arrest, Johnson remained incarcerated in Arlington County for nine days until he posted a cash bond and was released subject to conditions. [Dkt. No. 1] at ¶ 72.

in the light most favorable to the plaintiff, it need not accept "unwarranted inferences, unreasonable conclusions, or arguments." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (quoting Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 616 n.26 (4th Cir. 2009)).

Johnson's Complaint raises two causes of action: a malicious prosecution claim under 42 U.S.C. § 1983 and a Virginia common-law claim for malicious prosecution. A "malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure[,] which incorporates certain elements of the common law tort." Lambert v. Williams, 222 F.3d 257, 261 (4th Cir. 2000). "To state such a claim, a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in the plaintiff's favor." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012).[5]

A Virginia common-law action for malicious prosecution requires the plaintiff to prove that the prosecution was "(1) malicious; (2) instituted by or with the cooperation of the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." Lewis v. Kei, 708 S.E. 2d 884, 889 (Va. 2011). "Actions for malicious prosecution arising from criminal proceedings are not favored in Virginia and the requirements for maintaining such actions are more stringent than those applied to other tort cases to ensure that criminal prosecutions are brought in appropriate cases without fear of reprisal by civil actions." Id. (citing O'Connor v. Tice, 704 S.E. 2d 572, 575 (Va. 2011); Ayyildiz v. Kidd, 266 S.E. 2d 108, 110-11 (Va. 1980)).

---

[5] For purposes of Johnson's § 1983 claim, an indictment constitutes a seizure pursuant to legal process and an acquittal constitutes a proceeding terminated in a plaintiff's favor. Both are undisputedly present in this civil action.

7

Detective Ortiz puts forward five arguments to support her Motion to Dismiss Johnson's Complaint: 1) probable cause existed for Johnson's arrest, 2) Johnson fails to allege malice, 3) Detective Ortiz did not cause criminal proceedings to be initiated and instituted against Johnson, 4) Detective Ortiz's grand jury testimony was not material, and 5) Detective Ortiz is entitled to absolute immunity for her grand jury testimony. See generally [Dkt. No. 10]. The Court need only address the immunity and causation arguments in order to conclude that Johnson fails to state a claim under Fed. R. Civ. P. 12(b)(6).

Detective Ortiz argues that she is entitled to absolute immunity for her testimony to the grand jury under the United States Supreme Court decision in Rehberg v. Paulk, 566 U.S. 356 (2012). In Rehberg, the Court unanimously held that a "grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony," 566 U.S. at 369, arriving at this rule by reasoning that the factors that justify absolute immunity for trial witnesses "apply with equal force to grand jury witnesses," including law enforcement officers. Id. at 367. In both trial and grand jury contexts, a witness' fear of retaliatory civil litigation may deprive the tribunal of critical evidence, and in neither context is the deterrent of potential civil liability needed to prevent perjurious testimony because perjury before a grand jury is a serious criminal offense. See id. (citing 18 U.S.C. § 1623(a)). The Rehberg Court also refused to distinguish between law enforcement witnesses and lay witnesses, cautioning that defendants could often "transform resentment at being convicted into allegations of perjury by the State's official witnesses." Id. at 368 (cleaned up). The Court went on to hold:

> [A] grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony. . . . [T]his rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, "a

> criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." Buckley v. Fitzsimmons, 509 U.S. 259, 283 (1993) (Kennedy, J., concurring in part and dissenting in part) . . . . In the vast majority of cases involving a claim against a grand jury witness, the witness and the prosecutor conducting the investigation engage in preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony. We decline to endorse a rule of absolute immunity that is so easily frustrated.

566 U.S. at 369-70; see also Everette-Oates v. Chapman, 2021 WL 3089057, at *5 (4th Cir. July 22, 2021) (describing grand juror witness immunity as "broad in scope" and extending to claims of conspiracy to present false evidence and preparatory activity).

Johnson attempts to distinguish the Supreme Court's decision in Rehberg by pointing to a "good faith" requirement in two decisions from the Western District of Virginia, see [Dkt. No. 15] at 18-20 (citing Lewis v. McDorman, 820 F. Supp. 1001 (W.D. Va. 1992); Caldwell v. Green, 451 F. Supp. 2d 811 (W.D. Va. 2006)); however, both Lewis and Caldwell pre-date Rehberg. Moreover, the Supreme Court in Rehberg did not impose the "good faith" requirement that the Western District of Virginia discussed in those cases. Instead, the Supreme Court observed that grand jury witnesses "should enjoy the same immunity as witnesses at trial." Rehberg, 566 U.S. at 369. The Court further emphasized that law enforcement witnesses were entitled to the exact same absolute immunity as lay witnesses. Id. at 368-69. Accordingly, Lewis and Caldwell are inapposite, and Rehberg applies with full force to Detective Ortiz's grand jury testimony.

At oral argument, counsel for Johnson acknowledged the far reach of Rehberg in § 1983 actions. To mitigate that constraint, Johnson shifted away from the argument in his brief that the core of Detective Ortiz's unconstitutional conduct was her grand jury testimony, and counsel asked the Court to instead focus on Detective Ortiz's conduct during the investigative phase of

9

Johnson's criminal case. To support that shift, Johnson contends that Rehberg immunity does not extend to all of a witness' actions outside of the grand jury room, and thus the Court should allow his claim against Detective Ortiz to proceed based on her conduct solely during the investigative phase of his criminal case. See [Dkt. No. 15] at 25-26 (citing Rehberg, 566 U.S. at 370 n.1).

In a footnote in Rehberg, the Supreme Court stated:

> Of course, we do not suggest that absolute immunity extends to all activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who falsify affidavits, . . . and fabricate evidence concerning an unsolved crime[.]

566 U.S. at 370 n.1 (citing Kalina v. Fletcher, 522 U.S. 118, 129-131 (1997); Buckley v. Fitzsimmons, 509 U.S. 259, 272-276 (1993)). The Supreme Court did, however, extend absolute immunity to what it determined was "preparatory activity, such as a preliminary discussion in which the witness relates the substance of his intended testimony" to the prosecutor. Id. at 370.

Johnson relies heavily on Rehberg's footnote citing Kalina and Buckley as examples of factual scenarios independent of grand jury testimony where a malicious prosecution claim can survive. This argument is unpersuasive. In Kalina, the Supreme Court allowed a § 1983 claim for malicious prosecution to proceed against "a prosecutor for making false statements of fact in an affidavit supporting an application for an arrest warrant" because the prosecutor was acting outside the bounds of the traditional functions of an advocate and instead serving as a "complaining witness." See generally Kalina, 522 U.S. 118. Unlike the defendant in Kalina, although Detective Ortiz was the lead investigator of the Cincotta murder, she never obtained a warrant for Johnson's arrest and plaintiff has not alleged that Detective Ortiz provided false statements in an affidavit to secure any warrant.

10

Moreover in <u>Buckley</u>, the petitioner sought damages under § 1983 against prosecutors who were alleged to have fabricated evidence during the preliminary investigation through the use of an unreliable expert known to fabricate testimony and for making false statements at a press conference announcing the return of an indictment in a highly publicized rape and murder case. The petitioner was arrested and incarcerated for three years, but was released after a jury was unable to reach a verdict. In evaluating whether the prosecutors were entitled to absolute prosecutorial immunity, the Supreme Court held that the prosecutors were acting not as advocates but as investigators when attempting to fabricate evidence, thus they were entitled only to qualified immunity. As to the prosecutors' statements to the media, the Court reasoned that only qualified immunity was appropriate because there was no common law absolute immunity for prosecutors' out-of-court statements to the press which have no functional tie to the judicial process. Unlike the actions of the prosecutors in <u>Buckley</u>, which were designed to furnish an indictment and ultimately sustain a conviction, Detective Ortiz did not have the capacity under state law to convene a special grand jury, nor did she have the independent authority to prosecute the case after an indictment was returned. <u>See</u> Va. Code § 19.2-206. As the Court explained in <u>Rehberg</u>:

> [I]t is almost always a prosecutor who is responsible for the decision to present a case to a grand jury, and in many jurisdictions, even if an indictment is handed up, a prosecution cannot proceed unless the prosecutor signs the indictment. It would thus be anomalous to permit a police officer who testifies before a grand jury to be sued for maliciously procuring an unjust prosecution when it is the prosecutor, who is shielded by absolute immunity, who is actually responsible for the decision to prosecute.

566 U.S. at 372-73 (citation omitted).

Johnson retreats to a common refrain that Detective Ortiz "set in motion and continued to push forward the criminal proceedings" against him, independent of her grand jury testimony.

11

See, e.g., [Dkt. No. 15] at 27; [Dkt. No. 1] at ¶ 80. To support his argument that the Court should differentiate between law enforcement officers who provide only grand jury testimony and those who "set the wheels of government in motion" by conducting investigative activity in addition to testifying before a grand jury, Johnson cites Coggins v. Buonora, 776 F.3d 108 (2d Cir. 2015), in which the Second Circuit explained:

> When a police officer claims absolute immunity for his grand jury testimony under Rehberg, the court should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony. If the claim exists independently of the grand jury testimony, it is not "based on" that testimony, as the term is used in Rehberg. Conversely, if the claim requires the grand jury testimony, the defendant enjoys absolute immunity under Rehberg.

Coggins, 774 F.3d at 113.[6]

Focusing on all of Detective Ortiz's investigative conduct as alleged in the Complaint, and setting aside her grand jury testimony, the Complaint does not allege that Detective Ortiz fabricated any evidence during the investigative phase of the proceeding and presented such fabricated evidence to the prosecutor, nor does it allege that Detective Ortiz did anything to pressure the prosecutor such that she overbore the will of the prosecutor by presenting materially false evidence or omitting exculpatory evidence. In fact, the Complaint does not allege any conduct by Detective Ortiz—unconstitutional or otherwise—for five years before her grand jury

---

[6] In Coggins v. Buonora, 776 F.3d 108 (2d Cir. 2015), the Second Circuit declined to provide absolute immunity to a police officer who fabricated evidence in police reports, in communications with the district attorney, and in radio transmissions. Id. at 113. Johnson also relies on King v. Harwood, 852 F.3d 568, 584 (6th Cir. 2015), in which the Sixth Circuit found that the defendant police officer falsified affidavits and evidence in order to secure an indictment and conviction. Johnson makes no similar allegations in his Complaint; rather, the gravamen of Johnson's claims against Detective Ortiz arise from allegedly incriminating testimony that was presented to the grand jury and allegedly exculpatory information that was not. See [Dkt. No. 1] at ¶ 68.

12

testimony. See [Dkt. No. 1] at ¶¶ 49-50 (alleging no facts between 2013 when Detective Ortiz opened the cold case and June 27, 2018, when Kevin Cincotta wore a recording device in an attempt to elicit an admission from Johnson). Instead, the Complaint concentrates on Detective Ortiz's "false and misleading testimony" to the special grand jury, which resulted in "the grand jury [finding] probable cause to indict [] Johnson for the murder-for-hire of [] Cincotta." [Dkt. No. 1] at ¶¶ 68, 70.

Having considered Johnson's Opposition to defendant's Motion to Dismiss and his counsel's oral argument, it is evident that Johnson is attempting to bypass Detective Ortiz's absolute immunity as a grand jury witness under Rehberg by now claiming that the core of his malicious prosecution claim does not rest on her testimony to the grand jury but instead centers on her opening the cold case and conducting an eight year investigation into Cincotta's murder that culminated in her testimony. But as both the Supreme Court and Fourth Circuit have explained, grand jury witness immunity may not be circumvented by claiming that a witness undertook preparations to present false testimony to the grand jury. "Were it otherwise, a [] defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." Day v. Johns Hopkins Health Sys. Corp., 907 F.3d 766, 779 (4th Cir. 2018) (quoting Rehberg, 566 U.S. at 369) (cleaned up). Because the Complaint's primary allegations relate to Detective Ortiz's grand jury testimony, for which she is entitled to absolute immunity under Rehberg, the Complaint fails to sustain the § 1983 and common law claims.

Even if Detective Ortiz did not have absolute immunity, the decision of the special grand jury to indict Johnson and the Commonwealth Attorney's decision to prosecute him serve as intervening actions that severed the causal chain between Detective Ortiz's alleged

unconstitutional conduct and plaintiff's injury. Constitutional torts, such as malicious prosecution, "require a demonstration of both but-for and proximate causation." Evans, 703 F.3d. at 647. The subsequent acts of independent decisionmakers, including prosecutors, grand juries, and judges, may constitute intervening superseding causes that break the causal chain between a law enforcement officer's misconduct and a plaintiff's unlawful seizure. See id. Generally, "such intervening acts of other participants in the criminal justice system insulate a police officer from liability." Id. (cleaned up). A police officer may remain liable for malicious prosecution even when a prosecutor retains all discretion to seek an indictment, only under certain narrow circumstances, such as when an officer "lied to or misled the prosecutor," "failed to disclose exculpatory evidence to the prosecutor," or "unduly pressured the prosecutor to seek the indictment." Id. at 647-48 (collecting cases).

Put differently, a police officer is not liable for a plaintiff's unlawful seizure following an indictment "in the absence of evidence that [the officer] misled or pressured the prosecution." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007); see also Snider v. Lee, 584 F.3d 193, 206 (4th Cir. 2009) (Stamp, J., concurring) ("A law enforcement officer who presents all relevant probable cause evidence to a prosecutor . . . is insulated from a malicious prosecution claim where such intermediary makes an independent decision . . . unless the officer [1] concealed or misrepresented facts or [2] brought such undue pressure to bear on the intermediary that the intermediary's independent judgment was overborne.").

Virginia law recognizes three types of grand juries: regular grand juries under Va. Code §§ 19.2-193, et seq., special grand juries under Va. Code §§ 19.2-206, et seq., and multi-jurisdiction grand juries under Va. Code §§ 19.2-215.1, et seq. [Dkt. No. 10] at 11. Detective Ortiz testified before a special grand jury, which can be impaneled only by a circuit court: 1) on

14

its own motion, 2) upon the recommendation of certain members of a regular grand jury, or 3) upon request of the Commonwealth Attorney. See Va. Code § 19.2-206. A special grand jury has subpoena power to require testimony and produce specified records. Va. Code § 19.2-208. A majority, but not less than five, members of a special grand jury must concur in order to return a true bill of indictment. Va. Code § 19.2-213.

Detective Ortiz argues that she had "no legal authority to convene the special grand jury which issued the true bill of indictment against Johnson," because a "special grand jury can only be convened by the court, certain members of the regular grand jury, or the Commonwealth's Attorney," and that "it was the indictment issued by the special grand jury based on its finding of probable cause, after hearing testimony and evidence from eight witnesses, which set in motion the criminal proceedings against Johnson," not Detective Ortiz's special grand jury testimony or investigation alone. [Dkt. No. 10] at 12-13.

Johnson responds that Detective Ortiz "caused" the indictment by making certain false statements to the special grand jury mischaracterizing Leonard's description of the crime and how Johnson related to it. Specifically, Johnson argues that Detective Ortiz told the special grand jury that Leonard identified Johnson by name in his October 2018 statement. Although Detective Ortiz denies having made any false statements to the grand jury, she claims that the special grand jurors did not have to rely on the alleged false statement because they were able to consider the reliability of Leonard's testimony for themselves and were able to ask Leonard any questions they believed necessary to evaluate his testimony. Johnson also argues that Detective Ortiz omitted from her testimony information about Johnson's relationship with Cincotta, including his financial position relative to hers. Again, because Johnson testified before the

15

special grand jury, he was in a position to present this information to the body before it decided to indict him.

In evaluating a § 1983 claim for malicious prosecution, the Fourth Circuit in <u>Evans</u> rejected the plaintiffs' argument that officers remained liable because they "misrepresented, withheld, or falsified evidence that ultimately <u>influenced the grand jury</u>," 703 F.3d at 648 (emphasis in original), explaining that an "act of <u>either</u> the prosecutor <u>or</u> the grand jury may break the causal chain," <u>id.</u> (emphasis in original), and thus a "prosecutor's independent decision to seek an indictment breaks the causal chain unless the officer has misled or unduly pressured the prosecutor," <u>id.</u> at 649 (rejecting a "reasonable foreseeability" test for evaluating officers' statements to a prosecutor). Here, the Complaint does not plead sufficient facts to plausibly allege that Detective Ortiz "lied to or misled the prosecutor;" "failed to disclose exculpatory evidence to the prosecutor;" or "unduly pressured the prosecutor to seek the indictment." Accord <u>Evans</u>, 703 F.3d at 647-49. Instead, the Complaint's allegations focus on Detective Ortiz's testimony to the special grand jury; however, that grand jury also heard testimony from seven other witnesses, including plaintiff, and its decision to indict Johnson was independently supported by the Commonwealth Attorney who chose to prosecute the case after the indictment was returned.

The cases relied upon by Johnson in his Opposition to defendant's Motion to Dismiss pre-date the Fourth Circuit's decision in <u>Evans</u> and involve factual scenarios in which law enforcement officers fabricated evidence to obtain a warrant or misled prosecutors to a substantial degree to obtain indictments. Johnson fails to cite any case that mirrors the factual scenario here, in which the grand jury indicted the plaintiff after having heard the plaintiff's testimony, as well as the testimony of the defendant and six other witnesses. For these reasons,

16

Johnson's claims fail because the special grand jury and the Commonwealth Attorney independently made decisions to indict and prosecute the case against Johnson, severing the connection between Detective Ortiz's alleged unconstitutional investigative conduct and Johnson's injury.

III.

For these reasons, defendant Detective Rosa Ortiz's Motion to Dismiss, [Dkt. No. 9], will be granted and plaintiff James Christopher Johnson's Complaint, [Dkt. No. 1], will be dismissed with prejudice by an order to be issued with this Memorandum Opinion.[7]

Entered this 28 day of February, 2024.

Alexandria, Virginia

/s/ *signature*
Leonie M. Brinkema
United States District Judge

---

[7] Because the Court finds that Detective Ortiz is entitled to absolute immunity for her grand jury testimony, dismissal with prejudice is appropriate. See Khoraki v. Longoria, 2022 WL 17342619, at *6 (E.D. Va. Nov. 29, 2022) (dismissing a complaint with prejudice after finding that plaintiff's malicious prosecution claim was barred by absolute immunity); Phatisis v. Clark, 2013 WL 4098488, at *8 (E.D. Va. Aug. 13, 2013) (similar). Neither at oral argument nor in his Opposition did plaintiff request leave to amend his Complaint if the Court decided to grant defendant's Motion to Dismiss. At oral argument, defendant argued that the Complaint as pled focused nearly exclusively on Detective Ortiz's grand jury testimony as the basis for plaintiff's injuries. In response, plaintiff did not request leave to amend his Complaint to add allegations of unlawful conduct outside of defendant's grand jury testimony. Moreover, even if plaintiff attempted to plead additional facts related to Detective Ortiz's investigation, the Court's analysis as to causation and the intervening decisions of the special grand jury and the prosecutor would bar Johnson's claim. For these reasons, dismissal with prejudice is appropriate, because "it is clear that amendment would be futile in light of the fundamental deficiencies in [the] plaintiff[']s theory of liability." Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 630 (4th Cir. 2008).